# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

AD TAPE AND LABEL CO., INC.,

                Plaintiff,

      v.                                      Case No. 08-CV-892

SILVER EAGLE LABS, INC.,

                Defendant.

_____

## ORDER

On August 29, 2008, plaintiff Ad Tape and Label Co., Inc. ("ATL") filed suit in Waukesha County Circuit Court against defendant Silver Eagle Labs, Inc. ("SEL"). On October 21, 2008, SEL removed the action to federal court. ATL is a Wisconsin corporation with its principal place of business in Menomonee Falls, Wisconsin; SEL is a Nevada corporation with its principal place of business in San Mateo, California. The parties are completely diverse, and a good-faith estimate of the amount-in-controversy is well over $75,000, thus this court has jurisdiction over the matter pursuant to 28 U.S.C. § 1332. Because a substantial portion of the events giving rise to the claims occurred in the Eastern District of Wisconsin, and because the county in which the state court action was pending is located in the Eastern District of Wisconsin, venue is proper under 28 U.S.C. § 1391(a)(2) and 28 U.S.C. § 1441(a).

On March 11, 2009, SEL served its First Set of Requests for Admission ("RFA") on ATL. (Sarakas Decl. [Dkt. #21], Ex. B). Per Fed. R. Civ. P. 36, ATL was

required to respond by April 13, 2009. Fed. R. Civ. P. 36(a)(3). ATL did not respond. Failure to answer constitutes an admission, *Mangan v. Broderick & Bascom Rope Co.*, 351 F.2d 24, 28 (7th Cir. 1965), and an admitted fact is "conclusively established," Fed. R. Civ. P. 36(b). Thus, SEL may rely on the facts established in its RFA in its motion for summary judgment.

SEL moved for summary judgment on June 5, 2009. SEL sought summary judgment as to each of ATL's claims (Ct. 1: Breach of Contract; Ct. 2: Promissory Estoppel; and Ct. 3: Account Stated), as well as to two of its own eleven counter-claims (C.C. 1: Declaratory Judgment that the Parties' Manufacturing Agreement is Invalid, and C.C. 11: Conversion). SEL filed proposed findings of fact in support of its motion for summary judgment (*see* Def. Statement of Fact ["DSOF"] [Dkt. #19]). In its proposed findings of fact, SEL noted the proposed facts to which ATL had been unwilling to stipulate. However, ATL failed to file a response to SEL's proposed findings of fact.[1] Pursuant to Civil L.R. 56.2(e):[2] "In deciding a motion for summary judgment, the Court must conclude that there is no genuine material issue as to any proposed finding of fact to which no response is set out." Thus, the court will adopt and rely on SEL's proposed facts. *See Salvadori v. Franklin School Dist.*, 221 F. Supp. 2d 957, 960 (E.D. Wis. 2001) ("Because the plaintiff has not contested any of

---

[1] Not only did ATL not oppose SEL's proposed facts, but ATL also did not file any proposed facts of its own in support of its opposition to summary judgment.

[2] Civil L.R. 56.2(e) was supplanted by Civil L.R. 56(b)(4) when the new Local Rules went into effect on January 26, 2010. However, the briefing of the instant matter was concluded prior to that date, thus, said briefing is governed by the rules in effect at that time.

-2-

the factual findings proposed by the defendants as contemplated under Local Rule 56.2, the court is permitted to conclude that the facts, as identified by the defendants in their proposed findings of fact, are undisputed.") (citing *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921-22 (7th Cir. 1994)).

In opposition to SEL's motion for summary judgment, ATL filed an opposition brief. Regrettably, ATL's submission proved unhelpful to the court since it failed to identify or address several of the legal issues and cited only two cases without reference to any proposed findings of fact in support of its position. Nonetheless, SEL is the moving party and, thus, maintains the burden of demonstrating that it is entitled to summary judgment as to ATL's claims as well as its own. Because the court finds that SEL has met this burden, the court is obliged to grant SEL's motion for summary judgment.

## BACKGROUND

On October 19, 2006, PCI Technology, Inc. ("PCI") – a company SEL had contracted to manufacture nasal strips for SEL – was sold to Brady Medical LLC ("Brady"). (DSOF ¶¶ 3-4). Because Brady did not want to produce nasal strips for SEL, SEL began searching for another manufacturer. (Id. ¶6-7). Before SEL had found another manufacturer, PCI placed SEL's nasal strip business with ATL to continue shipment of SEL's product while SEL continued its search for a long-term nasal strip manufacturer. (Id. ¶9). One of the potential manufacturers that SEL spoke with was a company named Aso, LLC ("Aso").

Case 2:08-cv-00892-JPS   Filed 03/26/10   Page 3 of 26   Document 38

On November 16, 2006, SEL and ATL held a meeting at which SEL explained its production requirements, and at which ATL assured SEL it had the preexisting production capacity to accommodate SEL's production needs. (Id. ¶ 12-13). The parties also discussed various other issues related to the question of whether ATL would be a suitable long-term partner for SEL. (Id. ¶¶ 12, 14).

Also, on November 16, 2006, unbeknownst to SEL at the time, PCI shipped all of SEL's nasal strip production materials to ATL so that ATL could transition from shipping SEL's product to actually manufacturing SEL's product. (Id. ¶¶ 14-15). SEL learned of this on November 17, 2006. (Id. ¶ 17).

Between November 2006 and December 2006, ATL and SEL continued to discuss a potential manufacturing agreement. (Id. ¶ 23). During these discussions, ATL assured SEL that it would only take three to four weeks from the date such an agreement was reached until ATL could be in a position to satisfy SEL's high-volume production requirements. (Id.) Further, ATL represented that it could satisfy not only the quantity production requirements, but also the quality requirements as well, while remaining cost competitive. (Id.).

On December 4, 2006, SEL and Aso agreed that Aso would be SEL's new manufacturer. (Id. ¶ 24). SEL notified ATL of this occurrence on December 5, 2006. (Id. ¶ 25). However, on December 20, 2006, subsequent negotiations between Aso and SEL broke down and, therefore, SEL resumed its discussions with ATL. (Id. ¶ 27). During these renewed discussions, ATL again represented that it had pre-

existing production capacity to produce high-quality nasal strips on a cost-competitive basis. (Id. ¶ 27). In response to such representations by ATL, SEL signed a Manufacturing Agreement ("the Agreement") with ATL on December 21, 2006. (Id. 28). In the email correspondence between SEL's president, Michelle Lockwood, and ATL's president, Donald Dobert, that led to the signing of the Agreement, Lockwood stated that SEL would sign the contract "with the understanding that [SEL and ATL would] create a sensible, reasonable, and mutually beneficial termination addendum." (Id. ¶ 30). Dobert agreed to this condition. (Id. ¶ 31).

On January 31, 2007, ATL informed SEL that it was raising, by roughly fifty percent, the per strip price it was charging SEL. (Id. ¶ 34). SEL protested the price increase by withholding a portion of the invoices charged by ATL. (Id. ¶ 36). In response, ATL stated that it would cease nasal strip shipments to SEL customers unless ATL's invoices were paid in full. (Id. ¶ 37). Because SEL had no other alternative that would allow it to keep its commitments to its customers, SEL paid ATL's increased price under protest. (Id. ¶¶ 38-39).

Despite ATL's representations during the negotiations, it took nearly four months for ATL to meet the specified production levels. (Id. ¶ 41). ATL's faiure to meet SEL's production requirements resulted in thirteen cancelled orders and three delayed shipments, ultimately costing SEL $691,757.52 in lost revenue. (Id. ¶ 42).

In May 2007, SEL began receiving complaints from Target (one of the retailers carrying SEL's nasal strips) regarding the decrease in product quality since ATL assumed manufacturing responsibilities for SEL's nasal strips. (Id. ¶ 46). On July 10, 2007, SEL completed a new webbing design for its strips. (Id. ¶ 47). The aim of the new design was to improve quality and reduce production costs. (Id. ¶ 46). ATL refused to implement the new design because it did not believe the design would work. (Id. ¶¶ 48, 57). Because ATL refused to implement the new design, SEL entered in a manufacturing relationship with another manufacturer known as Tapemark to produce strips utilizing the new design. (Id. ¶ 58). Ultimately, because Target customers had been experiencing problems with the ATL produced strips, SEL transferred all of its future Target production orders to Tapemark – the manufacturer that agreed to implement the new webbing design. (Id. ¶ 61).

From January 2008 through September 2008, SEL continued having ATL produce strips for SEL's Walgreens (a retailer carrying SEL's strips) orders because Tapemark did not have the production capabilities to handle the orders for both Target and Walgreens. (Id. ¶ 63). On September 5, 2008, ATL informed SEL that ATL was unable to fill a Walgreens shipment order. (Id. ¶ 64). SEL responded by notifying ATL that its refusal to fill the order constituted a termination of the parties' relationship and further demand that ATL return all of SEL's property (mainly consisting of packaging materials and production equipment). (Id. ¶ 65). ATL filed the instant suit on September 15, 2008.

Case 2:08-cv-00892-JPS   Filed 03/26/10   Page 6 of 26   Document 38

# ANALYSIS

## I. Summary Judgment Standard

Summary judgment is appropriate where the movant establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Material facts" are those facts which "might affect the outcome of the suit," and a material fact is "genuine" if a reasonable finder of fact could find in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate where a party has failed to make "a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 317. A party opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). Any doubt as to the existence of a material fact is to be resolved against the moving party. *Anderson*, 477 U.S. at 255.

## II. Validity of Manufacturing Agreement

SEL maintains that it is entitled to summary judgment as to ATL's Breach of Contract claim (Ct. 1) and as to its own Declaratory Judgment counterclaim (C.C. 1) because the December 21, 2006 Manufacturing Agreement ("the Agreement") is too indefinite to be enforceable. "[I]ndefiniteness as to an essential term of the agreement **prevents the creation** of an enforceable contract, because a contract

-7-

must be definite as to the parties' basic commitments and obligations." *Management Computer Services, Inc. v. Hawkins, Ash, Baptie & Co.*, 557 N.W.2d 67, 75 (Wis. 1996) (bold in original).[3]  According to SEL, the Agreement is indefinite as to two essential terms:  price and mechanism of termination, therefore, the Agreement is not an enforceable contract.

A.    **Price**

With respect to pricing, the Agreement states:

> **PRICING, DESCRIPTION OF PRODUCTS AND PRODUCT SPECIFICATIONS**
> Pricing, description of products and product specifications are set forth in Exhibit "A" attached or as may be periodically updated as necessary.
>
> **PRICING**
> All prices are F.O.B. shipping point (ATL) unless otherwise agreed to in writing.  In filling orders, delivery of 100% of order constitutes filling the order.  Silver Eagle shall be billed for quantities actually shipped.  Prices are subject to change upon thirty (30) days notice in writing.

(Lockwood Decl. Ex. D).  The parties never executed "Exhibit A," nor did they ever reach an agreement as to the price ATL would charge SEL for the strips it (ATL) produced.  (DSOF ¶ 33).

Wisconsin courts have held that "[p]rice is an essential term of any contract, and all agreements must be definite regarding compensation."  *McLaughlin v. Madson*, 1992 WL 276589, 1 (Wis. App.) (citing *Goebel v. National Exchangors, Inc.*, 277 N.W.2d 755, 765 (Wis. 1979)).  "In the absence of such information, there

---

[3] The parties agree that Wisconsin law applies.

is no meeting of the minds and therefore no contract." *McLaughlin*, at 1 (citing *Todorovich v. Kinnickinnic Mut. L. & B. Assoc.*, 298 N.W. 226, 227 (Wis. 1941)). Courts have, however, recognized two exceptions to this rule. *McLaughlin*, at 1. "First, the contract is enforceable if the parties provide a practicable and objective means by which a court may determine the compensation, and the compensation is not left to the future will of the parties." *Id.* (citing 1 CORBIN ON CONTRACTS § 97, AT 423-24 (1963)). "Second, while the parties may have expressed an agreement in terms so indefinite that the price cannot be determined, their performance may cure the defect." *McLauglin*, at 1 (citing *Nelsen v. Farmers Mut. Auto. Ins. Co.*, 90 N.W.2d 123, 131 (Wis. 1958)).

ATL argues that the Agreement specifies that the price may be changed with thirty days notice, thus no definite price was ever intended. However, this argument fails to appreciate that there must be some mechanism for the determination of price, as evidenced by the language regarding Exhibit A. Since the Agreement does not provide a mechanism for the determination of a price, and essentially leaves price to the future will of the parties, the first exception above is inapplicable.

ATL's only other argument is that, throughout most of the parties' relationship, SEL received invoices from ATL and paid those invoices without questioning the price per strip. However, the undisputed facts proffered by SEL establish that SEL did dispute ATL's price increases, and only paid the price charged by ATL because ATL refused to deliver SEL's products to the retailers if SEL did not pay in full.

(DSOF ¶ 36-38). There was no meeting of the minds at any point between the parties as to the price that would be charged, or as to the mechanism by which the price would be determined. ATL seems to maintain that the fact that SEL paid the price ATL charged means that the parties agreed. However, this fails to appreciate the nature of the relationship between SEL, ATL, and the retailers ATL was supplying. If SEL had done as ATL suggests, and registered its disagreement by not paying the price asked by ATL, ATL made it clear that it would not ship SEL's products to SEL's customers. It is not as though SEL could simply immediately turn to another manufacturer in order to have its orders filled. The only way SEL could avoid failing its customers was to pay whatever price ATL demanded.

In contrast, in *Nelsen v. Farmers Mutual Auto Ins. Co.*, 90 N.W.2d 123 (Wis. 1958), the Wisconsin Supreme Court found that Nelsen (an independent contractor) and Farmers Mutual Services did have an enforceable contract, despite indefiniteness as to compensation, because for six years the company paid Nelsen a certain commission rate and Nelsen accepted it without complaint. *Id.* at 50. Clearly, the plaintiff in *Nelsen*, if he did not agree with the rate he was being paid, could have simply stopped performing services for Farmers Mutual Services. The fact that he did not do so, nor did he object to the rate he was paid, brought the case within the above second exception. Conversely, in the instant case, SEL had no choice but to pay the rate charged, and SEL did register its disagreement regarding the price charged.

-10-

In some situations, courts have been willing to impose a "reasonable price" when a contract does not indicate the price. For example, in *Herder Hallmark Consultants, Inc. v. Regnier Consulting Group, Inc.*, 2004 WI App 134, 685 N.W.2d 564, the court found that a contract lacking a price for the transfer of a business from plaintiff to defendant was, nonetheless, enforceable because the conduct of the parties implied that a reasonable price should be imposed. *Id.* ¶¶ 7-15. In that case, though, the defendant had completely taken over the plaintiff's business and was running it, but had not paid because the parties had yet to agree on a price. *Id.* ¶ 11. The court reasoned that clearly there was a meeting of the minds between the parties regarding the sale of the business and that, as commercial actors in the marketplace, the parties had both intended a reasonable or market price for the transaction. *Id.* ¶ 15.

Such rationale does not translate to the instant case. Clearly, a party that takes over another party's business intends to pay for that business. However, it cannot be said that a party that places orders for nasal strips from a manufacturer, and pays the amount charged by that manufacturer, intends to be obligated to an exclusive seven year contract with that manufacturer. Indeed, SEL had been placing orders with ATL and paying for them for some time before the Agreement was signed. Conversely, in *Herder*, the defendant's taking over of the plaintiff's business could only mean that defendant intended to form a binding contract for the purchase of the business from plaintiff. Further, it is commonplace for businesses to be

-11-

appraised and have a value placed on them at a fixed point in time. Thus, a reasonable market price for a given business at a fixed point in time is a relatively insular and objectively quantifiable notion. The per unit price for a manufactured product (especially one for which the design will change over time) for a seven year period is not nearly as susceptible to objective determination. To say in the instant case that the parties intended a "reasonable market price" would be to completely ignore the nature of the business in which they were engaged. *See McLaughlin*, at 2 (explaining that Wisconsin courts will not imply a promise to pay a reasonable amount if the parties failed to specify the amount in a services contract).

Since the Agreement is indefinite as to an essential term (price), and since neither of the previously articulated exceptions apply, the Agreement is unenforceable for indefiniteness. Nothing about the course of the parties' dealings evidences that there was ever (especially at the time the Agreement was signed) a meeting of the minds as to either the appropriate price, or the mechanism by which the price would be determined.

**B.    Termination Provision**

The Agreement states the following:

> **TERM OF AGREEMENT**
> This exclusive Manufacturing Agreement shall be for a period of eighty-four (84) months beginning on the effective date.[4]

---

[4] No definition is given for "effective date." The effective date could reasonably be the date the Agreement was signed; it could also reasonably be the date the on which the Agreement was completed (through the addition of Exhibit A and a termination provision).

-12-

(Lockwood Decl., Ex. D). Despite the fact that the Agreement purports to be an exclusive contract binding SEL to ATL for seven years, nowhere in the Agreement is there a termination provision, nor any language setting forth a mechanism by which either party could terminate the contract. SEL maintains that a termination provision is an "essential term" of a seven year exclusive manufacturing agreement, and that the absence of a termination provision renders the Agreement indefinite and thus unenforceable.

"Certainty of contract terms and definiteness require mutual assent by way of a meeting of the minds." *Metropolitan Ventures, LLC v. GEA Associates*, 2006 WI 71, ¶ 24, 717 N.W.2d 58. In order to determine if there is sufficient evidence of objective mutual assent, the court is to examine both the wording of the contract as well as the surrounding circumstances in an attempt to discern the parties' intent. *Id.*

The wording of the Agreement is silent as to when or how the parties may terminate the Agreement. Were the Agreement for an indefinite period of time, the lack of a termination provision would almost certainly not be capable of rendering the Agreement unenforceable for indefiniteness. Rather, in such a case the court would merely find that the Agreement was terminable at will upon reasonable notice. However, the Agreement is not for an indefinite duration. Thus, to interpret the lack of a termination provision, as meaning that the Agreement was terminable at will upon reasonable notice, would entirely eviscerate the duration provision of the

Case 2:08-cv-00892-JPS   Filed 03/26/10   Page 13 of 26   Document 38

Agreement. Since no mutual assent regarding a termination provision is discernible from the language of the contract, the court will look to the parties' negotiations and the conduct of the parties in order to attempt to ascertain the intent of the parties. *See Lindquist Ford, Inc. v. Middleton Motors Inc.*, 2007 WL 3287848, 6 (W.D. Wis. 2007) *rev'd on other grounds*, *Lindquist Ford, Inc. v. Middleton Motors Inc.*, 557, F.3d 469 (7th Cir. 2009).

The primary conduct of the parties, relevant to their intent in regards to a termination provision, is found in an exchange of emails attendant to the formation of the Agreement. During the negotiation of the terms of the Agreement, Lockwood emailed Dobert and stated:

> No problem with the changes. We should put in language that deals with termination: e.g., buyout of ATL or Silver Eagle and how that would affect the contract to avoid outcomes like that of PCI's sale to Brady. We can do this later as an addendum.

> For your comfort level, I am willing to sign the revised contract with the understanding that we will create a sensible, reasonable, and mutually beneficial termination addendum or [sic] any other complexity we have not foreseen.

(Lockwood Decl., Ex. C). Dobert replied: "Yes, this is very much 'okay' with me." (Id.). SEL argues that this evidences that the parties intended that the Agreement was simply an "agreement to agree," and thus did not take effect until the addition of a termination provision. ATL argues that the termination provision was only concerned with the eventuality of a buyout, and thus the parties intended that the

-14-

contract only be terminable in the eventuality of a buyout of one of the companies. (Pl. Br. Opp. S.J. at 4). Conversely, ATL argues that the fact that SEL continued to place orders with ATL meant that SEL was comfortable with the Agreement and saw no need to add a termination provision, thus, the parties mutually assented to not having a termination provision. (Id. at 5).

Plaintiff's first argument is unavailing. The court does not agree that Lockwood's email evidences that the parties only intended for the Agreement to be terminable in the eventuality of a buyout. It may be that that is what the parties intended. Or it may be that Lockwood wanted to raise the termination provision issue through the utilization of a neutral example, rather than by stating that such a provision was necessary in case ATL failed to produce quality strips or failed to implement SEL's design upgrades. The court simply cannot ascertain the intent of the parties as to the terms the termination provision.

Plaintiff's second argument is more availing. As already established, the nature of SEL's business required that it continue to place orders with ATL because, regardless of how SEL felt about ATL, the fact is that at the time SEL had no other company to fill its orders. Thus, the mere fact that SEL continued to place orders despite the lack of a termination provision does not indicate an intent that the contract not contain a termination provision. However, the fact that SEL never proffered a termination provision, nor actively sought to negotiate the terms of such a provision, does indicate an intent that the Agreement not have a termination

-15-

provision.  This would not be the case if SEL could claim that its intent was for SEL and ATL's relationship to remain simply on a purchase order basis until the Agreement was completed (through the addition of a termination provision). However, such an argument would not be very convincing, as SEL's conduct – namely, sending a letter to ATL alleging breach of the Agreement[5] – evidences that at some point in time SEL thought that the Agreement had become binding, and yet it still did not seek the addition of a termination provision.[6]  (*See* Lockwood Decl., Exs. M & Q).

In the final analysis, it remains unclear whether there was ever any mutual assent as to a termination provision.  The email exchange between Lockwood and Dobert makes it clear that, at the time of signing, there was mutual assent that the Agreement was conditioned on the addition of a termination agreement.  However, the conduct of the parties does evidence an intent to have a contract without a termination provision.  Though having a seven year exclusive contract without a termination provision seems completely unreasonable, SEL has not pointed to any

---

[5] ATL argues that, in doing so, SEL ratified the Agreement.  However, as SEL points out: "The doctrine of ratification does not apply to a contract which is void at its inception."  *Greenlee v. Rainbow Auction/Realty Co., Inc.*, 582 N.W.2d 93, 97 (Wis. App.).

[6] The reason this line of reasoning is relevant to this analysis, but not to the analysis regarding the lack of a price, is because conceivably the parties could intend to have a contract without a termination provision, as this line of reasoning suggests.  However, the court has cited ample case law articulating the necessity of a price or a mechanism for determining price.

-16-

cases stating that a contract must have a termination provision[7] (as opposed to a price, which it has been established that a contract must set a price or a mechanism for determining price). Though the conduct of the parties strongly suggests that there was a mutual assent not to have a termination provision, the negotiation of the parties very strongly suggests that there was, at the inception of the Agreement,[8] mutual assent that the Agreement would be conditioned upon the addition of a termination provision. Whether this scenario renders the contract unenforceable due to indefiniteness is a difficult question to answer,[9] but ultimately the court finds that it is impossible to determine the intent of the parties in regards to a termination provision, and that the contract is, thus, unenforceable due to the indefiniteness of the existence and terms of such a provision.

A contract that is indefinite as to its essential terms is unenforceable unless the conduct of the parties cures the defect. The Agreement was clearly indefinite as to price, and nothing about the conduct of the parties cured this defect. Further, the court notes that a finding that the parties assented to a "reasonable price" is neither workable nor appropriate in the instant case. Because there was never mutual

---

[7] SEL did cite to *Lindquist Ford* for the proposition that the lack of a termination provision renders a contract unenforceable. 2007 WL 3287848. However, *Lindquist Ford* is inapposite because in that case the plaintiffs claimed that the defendant breached a termination provision. *Id.* at 6. Thus, the lack of a termination clause was fatal to plaintiffs' claim because such claim was premised on the breach of the termination provision. In the instant case, ATL's claim is premised on the breach of the exclusivity provision, not the termination provision.

[8] *See Metropolitan Ventures*, 2006 WI ¶ 22, n. 9 ("The definiteness requirement is an issue of contract formation, not interpretation.).

[9] The difficulty of which is exponentially exacerbated by the plaintiff's inexcusable failure to point the court to any relevant case law.

-17-

assent between the parties as to the issue of price, the parties never successfully formed a contract. Thus, SEL is entitled to summary judgment on ATL's Breach of Contract claim, as well as on its own claim for Declaratory Judgment that the Agreement is voidable. Completely independently, the contract is also voidable because the facts evidence a lack of mutual assent as to the existence and the composition of a termination provision.

## III.    Avoidability of the Manufacturing Agreement

While the court is confident that the Agreement is unenforceable due to indefiniteness (particularly as to price), a reversal of the court as to this matter would not significantly alter the outcome. This is because, wholly apart from being unenforceable due to indefiniteness, the Agreement is voidable by SEL because SEL's assent was induced through material misrepresentations. *See First Nat. Bank and Trust Co. of Racine v. Notte*, 293 N.W.2d 530, 538 (Wis. 1980) ("When a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party, the contract is voidable by the recipient if he is justified in relying on the misrepresentation.") (quoting Restatement (Second) of Contracts § 306(1)).

SEL's unopposed proposed findings of fact demonstrate that, during the parties' December 2006 discussions (after SEL's discussions with Aso broke down), ATL renewed its assertion that it had the pre-existing production capacity to meet SEL's quality and quantity requirements. SEL has also established that it took ATL

-18-

four months (not the promised three to four weeks) to meet SEL's quantity requirements, and that ATL continued to struggle with the quality requirements. Thus, SEL has established that ATL misrepresented its capabilities. However, the court makes no findings as to ATL's knowledge of the falsity of its misrepresentations. *See Whipp v. Iverson*, 168 N.W.2d 201, 204 (Wis. 1969) ("It is not necessary for rescission of a contract that the party making a misrepresentation should have known that it was false. Recovery is allowed even though misrepresentation is innocently made because [i]t would be unjust to allow one who has made false representations, even innocently, to retain the fruits of a bargain induced by such representations.") (citation omitted).

ATL's misrepresentations were of a material nature. "A misrepresentation is material if it is likely to induce a reasonable person to manifest his assent, or if the maker knows that it is likely that the recipient will be induced to manifest his assent by the representation." *Notte*, 293 N.W.2d at 538. ATL has admitted, through SEL's RFA, that "in October 2006 [SEL] told ATL that whether ATL could meet [SEL]'s nasal strip production requirements was an important consideration for [SEL] as [SEL] decided whether to use ATL to produce nasal strips." (Sarakas Decl., Ex. B, No. 41). Given this admission, any argument that ATL's representations regarding production capacity were not material would be disingenuous.

Not only were ATL's misrepresentations of a nature likely to induce SEL's assent, but they did induce SEL's assent. The unopposed proposed findings of fact

-19-

established that SEL entered into the Agreement with ATL, "based on the representations by ATL that it could manufacture high-quality nasal strips on a high-volume and cost-competitive basis." (DSOF ¶ 28).

Lastly, SEL was justified in relying on ATL's representations as to ATL's production capabilities. A party's reliance would not be "unjustified unless [its] fault amounts to a failure to act in good faith or to conform [its] conduct to reasonable standards of fair dealing." *Notte*, 293 N.W.2d at 539. ATL argues that SEL's reliance was unjustified[10] because SEL's representatives visited ATL's location twice prior to the signing of the Agreement, thus SEL knew ATL's capabilities. (Pl. Br. Opp. Mot. S.J. at 8). However, ATL does not cite any facts (such as a lack of machinery, or personnel, that would have been apparent at inspection) that would support its argument. Absent evidence that SEL's inspection of ATL's location should have alerted a reasonable person to ATL's lack of production capacity, the court finds that such an inspection evidences acting in good faith and fair dealing on SEL's part. The fact remains that ATL was in a far better position to know its own production capabilities than was SEL. SEL knew that ATL had received all of the materials from PCI, so ATL knew the production quantity that would be expected of it. Additionally, SEL trusted ATL because ATL had been chosen for it by PCI, with whom SEL had previously worked. Given these considerations, the court finds that

---

[10] The justifiable-reliance prong of the test was the only prong to which ATL raised a somewhat meritorious defense. As to the other prongs, ATL merely tried to argue against facts to which it had already admitted by failing to respond to SEL's RFA and proposed findings of facts.

-20-

SEL's fault in relying on ATL's representations certainly does not amount to a failure to act in good faith or to conform to reasonable standards of fair dealing.

It is conceivable that it could be argued that SEL's failure to seek rescission of the Agreement upon learning of ATL's misrepresentations should bar it from now seeking to hold the contract voidable. ATL makes no such argument, and it is not the court's role to create arguments for a party to litigation. Because SEL was reasonably induced to assenting to the Agreement as a result of ATL's material misrepresentations, SEL is entitled to avoid the contract if it is later held that the Agreement was in fact an enforceable contract.

## IV.    ATL's Claims of Promissory Estoppel and Account Stated

SEL has moved for summary judgment on counts two and three (Promissory Estoppel and Account Stated, respectively) of ATL's complaint. ATL's brief does not oppose SEL's motion for summary judgment as to these claims, thus, ATL is deemed to have abandoned these claims and SEL is accordingly awarded summary judgment as to these two claims. *Palmer v. Marion County*, 327 F.3d 588, 597-98 (7th Cir. 2003) (deeming plaintiff's negligence claim abandoned because he failed to argue it in his district court brief in opposition to summary judgment); *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 n. 2 (7th Cir.1996) (plaintiff abandoned claim after failing to respond to arguments in defendant's motion for summary judgment).

-21-

It is true that a party that fails, at the summary judgment phase, to respond to arguments against its claims does not always necessarily abandon such claims. A party may "stand on its pleadings" if those pleadings are supported by admissible evidence that creates a material factual question that the moving party fails to refute. *Thornton v. Evans*, 692 F.2d 1064, 1074 (7th Cir. 1983). However, ATL's pleadings are not supported by admissible evidence that creates a material factual question.

A claim of promissory estoppel involves answering three questions: "(1) whether the promise is one which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee; (2) whether the promise induced such action or forbearance; and (3) whether injustice can be avoided only by enforcement of the promise." *Bicknese v. Sutula*, 2003 WI 31, ¶ 12, 660 N.W.2d 289. In the instant case, the admitted evidence establishes that SEL's promise to enter into a seven-year exclusive contract with ATL was premised on the execution of a termination agreement. Further, equitable relief (such as promissory estoppel) is not available to a party with unclean hands. *Zinda v. Krause*, 528 N.W.2d 55, 62 (Wis. App. 1995). In the instant case, ATL's unilateral price increases, failure to meet production requirements, and refusal to implement SEL's design changes were at least equally, if not more so, responsible for the demise of the relationship as any of SEL's conduct.

-22-

In order to establish a cause of action for account stated, a party must show: "(1) an agreement as to a balance due on a disputed claim was reached; (2) one party promised to pay the balance; and (3) the balance remains unpaid." *Newgard ex rel. Newgard v. Bank of America*, 2007 WI App. 161, ¶ 12, 735 N.W.2d 578. According to ATL's complaint, the balance due is the balance outstanding on SEL's unpaid invoices. (Notice of Removal, Ex. 1, ¶¶ 31-33). ATL has not pointed the court to any admissible evidence, such as copies of unpaid invoices, supporting this claim. Nor has ATL directed the court to any admissible evidence supporting that the parties ever agreed to the amount owed as to these unpaid invoices.

Nothing in the admitted evidence creates a material factual question as to either ATL's Promissory Estoppel claim, or its Account Stated claim. Further, ATL has failed to oppose entry of summary judgment on behalf of SEL as to these claims. Therefore, the court deems these claims abandoned. SEL is, accordingly, entitled to summary judgment as to counts two and three of ATL's complaint.

V.      **Conversion**

SEL moves for summary judgment as to its eleventh counterclaim, Conversion. The parties agree that the general elements for a claim of conversion are: "(1) intentionally controlling/taking property belonging to another; (2) controlling/taking property without the owner's consent; and (3) those acts resulting in serious interference with the rights of the owner to possess the property." *Bruner v. Heritage Companies*, 593 N.W.2d 814, 818 (Wis. App. 1999). Because it is

-23-

uncontested that ATL lawfully and legitimately obtained possession of the property underlying this claim, SEL's claim is for the variant where a party wrongfully refuses "to surrender property originally lawfully obtained." *Product Credit Ass'n of Madison v. Nowatzski*, 280 N.W.2d 118, 123 (Wis. 1979). Under this variant, "a demand by the rightful owner and a refusal by the alleged tortfeasor are necessary elements of the tort." *Id.*

Through its non-response to SEL's Request for Admissions, ATL has admitted (and thus conclusively established) that in September, October, November, and Decmber of 2008, SEL demanded the return of all of its property from ATL. (Sarakas Decl. [Dkt. #21], Ex. B, Nos. 7-10). ATL has also admitted that it has not returned the property to SEL, and that SEL has thus been prevented from using its property. (Id. Nos. 11-18). However, ATL has not admitted that its retention of SEL's property was "wrongful" or that its retention of the property resulted from its "refusal" to return the property. According to Dobert, the property has not been returned to SEL because of a dispute between the parties regarding which party should pay for shipping. (Dobert Decl. [Dkt. #29] ¶ 87). Because ATL's position that it should not have to pay to ship the property (a position that the court makes no finding regarding) could be a legitimate position, it would be premature for the court to rule definitively that ATL has converted SEL's property. However, Dobert also stated that the property was not ready for shipment until December 15, 2008. (Id.). Because SEL has not shown that the delay, from September 2008 to December 15,

Case 2:08-cv-00892-JPS   Filed 03/26/10   Page 24 of 26   Document 38

2008, was wrongful, the court will not state definitively that ATL converted SEL's property during that time frame. However, it is clearly possible that ATL committed conversion by not returning SEL's property, or by interfering with SEL's right to use of its property until December 15, 2008. Whether or not ATL did in fact commit conversion through these actions remains a question for the finder of fact.

## CONCLUSION

The Agreement between the parties was sufficiently indefinite as to the essential terms regarding pricing, such that the contract was never properly formed and is thus unenforceable. Independently of the Agreement's indefiniteness as to price, the Agreement was also sufficiently indefinite as to a termination provision, such that the contract was never properly formed and is thus unenforceable. If the Agreement is found to be enforceable, SEL is permitted to avoid the contract because SEL's assent was induced through material misrepresentations upon which SEL justifiably relied. Additionally, ATL neither opposed SEL's motion for summary judgment as to its second and third claims, nor did its pleadings (and the attached evidence) present a material factual question as to those claims. ATL thus abandoned its second and third claims. Though SEL demonstrated some of the elements necessary to sustain a claim for conversion, it did not fulfill all of the elements, and thus it is not entitled to summary judgment as to that claim.

Accordingly,

-25-

**IT IS ORDERED** that defendant's motion for summary judgment (Docket #18) be and the same is hereby **GRANTED** as to the first, second, and third claim of plaintiff's complaint; and

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment (Docket #18) be and the same is hereby **GRANTED** as to the first claim of defendant's counterclaims; and

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment (Docket #18) be and the same is hereby **DENIED** as to the eleventh claim of defendant's counterclaims.

Dated at Milwaukee, Wisconsin, this 26th day of March, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

-26-